IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 17, 2003

## STATE OF TENNESSEE v. ANTHONY NATHANIEL GUERARD

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40689 and 40100422     John H. Gasaway, III, Judge**

_____

**No. M2002-01046-CCA-R3-CD - Filed August 4, 2003**

_____

In 1999, the Defendant was placed on judicial diversion for four years after pleading guilty to aggravated assault. In 2001, while the Defendant was on probation for aggravated assault, the Montgomery County Grand Jury indicted the Defendant for attempted first degree murder, attempted robbery, and aggravated kidnapping. In 2002, pursuant to a plea agreement, the Defendant pled guilty to reckless endangerment and nolo contendere to attempted robbery. Following a sentencing hearing, the trial court sentenced the Defendant to eleven months and twenty-nine days incarceration for reckless endangerment and to three years in the Tennessee Department of Correction for attempted robbery. The trial court also revoked the Defendant's judicial diversion probation for the 1999 aggravated assault charge, entered a judgment of conviction, and imposed a sentence of four years in the Tennessee Department of Correction. It ordered that the sentences for reckless endangerment and attempted robbery be served concurrently to each other but consecutive to the sentence for aggravated assault, resulting in an effective sentence of seven years. In this appeal as of right, the Defendant argues that his sentences are excessive and that the trial court erred by denying alternative sentencing. We conclude that the Defendant's sentences are proper and thus affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. ROBERT W. WEDEMEYER, J., not participating.

Russel A. Church, Assistant Public Defender, Clarksville, Tennessee, for the appellant, Anthony Nathaniel Guerard.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; John W. Carney, Jr., District Attorney General; James B. Crenshaw and Daniel Brollier, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. PROCEDURAL HISTORY**

In December 1999, the Defendant, Anthony Nathaniel Guerard, was placed on judicial diversion for a period of four years after pleading guilty to aggravated assault. In August 2001, while the Defendant was on probation for aggravated assault, the Montgomery County Grand Jury charged the Defendant with attempted first degree murder, attempted robbery, and aggravated kidnapping. On February 25, 2002, pursuant to a plea agreement, the Defendant pled guilty to reckless endangerment and nolo contendere to attempted robbery, and the trial court dismissed the charge of aggravated kidnapping. The manner of service of the sentences was left to the discretion of the trial court.

On April 3, 2002, following a sentencing hearing, the trial court sentenced the Defendant to four years for aggravated assault, to eleven months and twenty-nine days for reckless endangerment, and to three years for attempted robbery. Pursuant to the plea agreement, the court ordered that the sentences for reckless endangerment and attempted robbery be served concurrently. However, it further ordered that the sentence for aggravated assault be served consecutively with the other two sentences, resulting in an effective sentence of seven years. Finally, the court determined that the Defendant was not entitled to an alternative sentence and ordered the Defendant to serve his sentences in confinement. The Defendant now appeals his sentences, arguing that his sentences are excessive and that the trial court erred by denying him an alternative sentence.

**II. FACTUAL BACKGROUND**

A. Facts Presented at the Plea Agreement Hearing

At the plea agreement hearing, the State summarized the facts underlying the Defendant's pleas, with agreement by the Defendant, as follows:

> On the earlier morning of June 21st of 2001 the Defendant and the victim, Sheila Williams, were living together in a trailer. Mr. Guerard was married to another woman at that time. Ms. Williams and Mr. Guerard had been engaged in a relationship for about four years.
> When Ms. Williams returned home from her employment she changed her clothes and got dressed up to [go] out. At that time as she walked through the living room to leave Mr. Guerard stopped her from leaving the residence. He ripped her clothes off of her including her dress, and her panties, and her bra.
> The State's proof would show that he then put one foot on her arm to hold her down and another on her chest, and was beyond control in a rage. At that point after

he got off of her in that position he started dragging her back toward the bedroom, bathroom area of the mobile home. She told him I'll do anything you want; I'll do anything you want.

At that point he said words to the effect of I'm going to kill you like I should have last time. And at that point he drug her into the bathroom, ran water in the tub, put her in the bathtub and held her head under with his forearm behind her neck and her head jerked sideways.

She lay still for a few moments. He then brought her up out of the water, and said words to the effect, there's nothing wrong with you. And she had not swallowed any water at that point. He pushed her head back down in the water, held it in the same position. At that time she did swallow water. And, again, for a second time he brought her head up. She was spit[t]ing up water and coughing water.

He did pull her out of the bathtub at that point; hit her on the back in an effort to expel the water, and said words to the effect of see what love will make you do; it will make you kill. Then he went and got ice and put it on her face where it had been bruised, and took her into [the] bedroom and put her in the corner.

And at some point [he] left the trailer and went to her vehicle outside, retrieved her purse, and came back in and started rummaging through it.

While he was inside the purse he found two payroll checks that she had. He also found a slip of paper with the name Michelle written on it and a telephone number. And he started asking her questions still in a rage about who's Michael. He called it Michael rather than Michelle.

And started rummaging through her closet. He found another dress, which he held up and said who's – what's this; where did this come from? And she responded to him that this was the dress I wore to Nashville when I met you that time. And he proceeded to trash that dress. At that time he was also hitting her with a bedroom slipper, rubber bedroom slipper, about the face.

And she endorsed over the two payroll checks – or signed the back of two payroll checks that were in her purse. He then had her get dressed, and had her get into her car, and drove her to Kroger with the two checks. And as she entered Kroger he was holding her hand and also trying to kiss her, and she was resisting.

And he did park his vehicle next to a police car outside Kroger on Dover Road. When she entered the store and they approached the . . . check cashing machine she saw a police officer checking out, and she . . . walked over to that police officer and told him what was going on. . . .

The Defendant was following her. [The officer] stopped the Defendant and told him to stay where he was, and called for assistance. And he placed the Defendant under arrest after he had heard her story of what was occurring.

B. Facts Presented at the Sentencing Hearing

At the sentencing hearing, Michael Carwell, the victim of the aggravated assault offense, testified about the incident that led to the Defendant's conviction for which he was placed on judicial diversion in December 1999. Carwell reported that in December 1998, he and several other people went to Sheila Williams' home, where the Defendant was living at the time. He stated that they were all planning to go out together. Carwell testified that the Defendant "showed up out of nowhere" and announced that Williams, the victim, could not go out. According to Carwell, the Defendant then said, "[W]ell, you MFs go ahead on," and Carwell responded, "I ain't no MF." Carwell stated that the Defendant then "pulled a knife on [him] and came at [him] . . . [a]nd from there . . . caused [Carwell's] leg to be broke[n]." Carwell stated that the Defendant did not actually cut him with the knife.

Carwell described the injury he sustained that night as a complete break of his femur bone, and he stated that he was still having "problems" with his leg at the time of the sentencing hearing. He testified that he was still in pain, at times constantly, as a result of the injury. He also reported that he had to use a cane "off and on." Carwell testified that after breaking his leg, he stayed in the hospital for two days, where he underwent surgery. He testified that he initially could not return to work, and he stated that after he did return to work, he could not stand on the leg that had been broken. He stated that this affected his employment, and he reported that at the time of the hearing, he was unemployed and received disability payments, partially because of the injury to his leg. He also stated that he lost wages as a result of the injury because of his initial inability to work.

On cross-examination, Carwell testified that at the time of the incident, he had known Sheila Williams for approximately a year and a half, and he also stated that he had worked with the Defendant at Opryland for approximately six to eight months. In addition, he clarified that he broke his leg when the Defendant pushed him, causing him to fall to the ground outside the victim's home.

Sheila Williams, the victim of the remaining offenses, testified that on June 21, 2001, she stopped by Wal-Mart after work and then proceeded to her home. She stated that when she arrived home, she began dressing to go out. She testified that while she was getting ready, the Defendant told her to take off her dress, and when she refused, he "tore it off." She testified that the Defendant then "shoved [her] to the floor," put one foot on her arm, and put the other foot on her chest. She recalled that he said, "[Y]ou don't know who you're messing with." The victim testified that the Defendant then grabbed her by the arm, drug her into the back bedroom, and said he would "show [her] what [he] should have done to her the first time."

The victim testified that the Defendant next began to run water into the bathtub, while she told him that she would do "whatever [he] want[ed] to do." She stated that he then pushed her backwards into the bathtub, holding one hand on her face and the other hand behind her neck, and held her head under the water. She recalled that he raised her head out of the water for a second and then submerged her head again. The victim stated that at this point, she began to inhale water and started "gurgling," but the Defendant continued to hold her head under water for a while. She

testified that he then lifted her up and said, "[T]his is what love will make you do. It will make you kill." The victim recalled that at the time, she was choking and unable to breathe. She stated that the Defendant began hitting her back and said "ain't nothing wrong with you." Because the Defendant appeared to believe that she was "playing," the victim threw a towel and pointed at him so that he would hit her back again. The victim testified that the Defendant then got into the tub with her and hit her back for a while until she got up.

The victim reported that the Defendant next went out to her car and got her purse. She stated that when he came back inside, he asked her, "[W]hat [are] you doing with Michael's phone number?" The victim replied that the number he had seen belonged to her friend, Michelle. The victim testified that the Defendant then pushed her on the bed and began choking her while telling her not to lie to him. She reported that the Defendant next went to her closet, pulled out some clothes, and asked what shirt she wore with a specific skirt. The victim stated that she told him she had worn the skirt and a white shirt when she and her sister visited Nashville. She stated that the Defendant became angry and told her to "go sit in the corner." She stated that she did as told, and he began rummaging through her purse, asking her where her money was. She replied that she did not have any money and turned toward him. She recalled that the Defendant said, "[D]idn't I tell you not to turn around?" and began hitting her face with a shoe.

The victim testified that the Defendant soon noticed that her face had begun to swell, so he retrieved some ice and told her to hold it on her face. He then began rummaging through her purse again. She stated that the Defendant was aware that she would be paid the following day, so he asked the victim, "[Y]ou [sic] going to bring me a check, right, at 11:30?" The victim testified that when she responded that she could not give him the check at 11:30, he again became angry and again began to hit her on the face with the shoe. The victim then told him, "[Y]eah, whatever you want."

The victim testified that the Defendant next told her that they were going to go cash her checks and instructed her to endorse the checks, which she did. The Defendant then gave the victim some clothes, and they soon left and drove to a Kroger store. The victim stated that on their way, the Defendant acted as if nothing had happened. She recalled that when they entered Kroger, the Defendant was holding her hand and asked her for a kiss, which she gave him. However, she stated that once she was inside the store, she soon spotted a police officer, approached him, and told him what had happened.

The victim testified that she did not suffer any permanent physical injuries as a result of the incident, but stated that the incident had affected her psychologically and emotionally. She reported that she was suffering from "depression and stress," for which she took medication. She also stated,

> I've been having trouble sleeping, and not eating. And I live in fear day by day. I go home. I live alone. I leave almost every light on in my house every night, and the TV. And I'm constantly checking stuff and watching over my shoulder.

And dealing with people nowadays it's hard for me to trust, because if you can't trust someone you love then you think to yourself who can you trust?

With regard to the incident involving Michael Carwell, the victim testified that she attributed the Defendant's behavior that night to jealousy. She also stated that the incident involving Carwell led to the confrontation between her and the Defendant in June 2001.

On cross-examination, the victim admitted that after the death of the Defendant's grandfather in July 2001, approximately three weeks after the incident she had described on direct examination, she mailed the Defendant a condolence card at the Montgomery County Jail. She also admitted that after the incident in June 2001, she tried to use the Defendant's automatic teller machine (ATM) card. She stated that at the time of the incident, she had not cashed her two previous paychecks, but she denied that the Defendant was handling their finances at the time. The victim further admitted that approximately two years prior to the sentencing hearing, she had been placed on probation for assaulting the Defendant, and she stated that on several other occasions, she had brought criminal charges against the Defendant which were later dismissed. She reported that arguments between her and the Defendant were not uncommon. Finally, the victim testified that during her relationship with the Defendant, the Defendant often alternated between dating her and returning to his wife.

Amy Guerard, the Defendant's wife, testified that she and the Defendant had been married seven years, and she reported that she had known the Defendant for four years prior to their marriage. She stated that although they had argued during the course of their marriage, none of their arguments had ever resulted in physical violence, and she maintained that she had never called the police as a result of their arguments. She testified that she was aware that the Defendant had also been engaged in a relationship with Sheila Williams during the course of their marriage.

Guerard testified that if the Defendant were released from incarceration, he could live with his mother. She stated that she would also be willing to work with him regarding contact with their children.

Regarding the Defendant's work history, Guerard testified that her husband had been in the military and had had several other jobs during the course of their marriage. She stated that he had always maintained at least one full-time job and sometimes two full-time jobs during their marriage. She stated that when the Defendant was not working, he helped with the children, and she reported that even when the Defendant was with Williams, he contributed to their household.

Patty Guerard, the Defendant's mother, testified that she had been aware of the Defendant's relationship with Williams for approximately three years. She stated that she had spoken with the Defendant about the relationship on occasion, but had never condoned the relationship. She maintained that her son's relationship with Williams was "not good for" him, and she stated that the Defendant's relationship with Williams had "put a terrible strain on" her relationship with her son. She testified that she believed the Defendant initially did not understand the destructive nature of his

relationship with Williams, but had since realized that "it's not a very good relationship." She testified that at one point, the Defendant wished to live with Williams in his mother's home, but she refused to allow them to do so. She stated that the Defendant did not visit her house as frequently when he was dating Williams as when he was with his wife.

Patty Guerard testified that if the Defendant were released from incarceration, he could live with her. She stated that she had spoken to several people with whom the Defendant had worked, and they were willing to provide employment for the Defendant because he was a "good worker." In addition, she reported that she had a large family, consisting of nine brothers and sisters, her mother, and other relatives, who would be willing to help the Defendant. She also stated that she had visited her son twice a week for almost a year during his incarceration.

On cross-examination, the Defendant's mother testified that all criminal charges that had been brought against the Defendant related to his relationship with Sheila Williams. She stated that she had never known her son to carry a knife or to be violent towards other people. She also testified that the only confrontation the Defendant had ever had with his two sisters occurred because the sisters had attempted to talk to him about his relationship with Williams, and the Defendant asked them to leave his home.

The Defendant testified that he was twenty-six years old. He maintained that he did not wish to see or to talk to Williams again. He stated, "There is no future for me and Mrs. Williams." He testified that although he believed in June 2001 that he and the victim were "in love," he believed at the time of the sentencing hearing that they "both were wrong." He also testified that if the victim telephoned him after the hearing, he would say, "I'm sorry, you have the wrong number."

The Defendant testified that he had received previous criminal charges of domestic assault involving Williams. However, he stated that all previous charges against him had been dismissed. He explained that Williams had agreed to drop all charges against him if he went with her to Louisiana in 1999, so he complied, and all charges were dismissed. He also stated that on at least one occasion, Williams had been placed on probation for domestic assault against him. The Defendant testified that other than receiving the condolence card from the victim, he had had no contact with her since he had been incarcerated, and he stated that she had never offered to drop the charges against him in this case.

The Defendant testified that he did not agree with the recitation of facts presented by the State at his plea agreement hearing. He denied that he pushed the victim under water in the bathtub. He also denied hitting the victim with a shoe. However, the Defendant admitted that during an argument with the victim, he hit her with his open hand, causing her face to swell. He stated that the argument occurred while the victim was preparing to go out for the evening, and he reported that he asked her that night to take him back to his wife's house, where he had stayed the previous three nights.

The Defendant testified that he was working two jobs in June 2001. He stated that he worked at Rudolph Transfer and Storage, where he earned approximately $200 to $250 each week and where he worked at least three to four days per week. He reported that he also worked at Letica Corporation, where he earned approximately $300 each week and where he worked between thirty-six and forty-eight hours per week. He stated that on June 21, 2001, he had money in the bank because he had been paid that day. He explained that he and the victim had agreed to share the cost of the trailer where they lived, but the utilities were in his name, and he had paid the utility deposits. He stated that because they had just moved into the trailer, they had not yet paid a full first month's rent. The Defendant stated that he and the victim had cashed paychecks at the Kroger on other occasions.

The Defendant stated that if he were to be released from incarceration, he had job prospects available. He stated that two individuals had contacted his wife during his incarceration to tell her that they were willing to hire him.

On cross-examination, the Defendant denied that he approached Michael Carwell with a knife, although he admitted possessing a knife. He also claimed that the victim's testimony was "fabricated." He maintained that on June 21, 2001, he was in the bathtub when the victim came home, but he denied holding the victim's head under water. He also testified that he did not hit her with a shoe. He stated, "Mrs. Williams has a sister that is [a] high price lawyer in Chicago. She . . . knows how to manipulate the law." He also stated, "I do not admit to any of those things happening. The reason why Mrs. Williams has fabricated this whole story is because after four years I finally told Mrs. Williams that I would never marry her."

III. ANALYSIS

The Defendant argues that he was improperly sentenced. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the

potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996).

Enhancement factors must be "appropriate for the offense" and "not themselves essential elements of the offense." Tenn. Code Ann. § 40-35-114.

> The obvious purpose of these limitations is to exclude enhancement factors which are not relevant to the offense and those based on facts which are used to prove the offense. Facts which establish the elements of the offense charged may not also be the basis of an enhancement factor increasing punishment. The legislature, in determining the ranges of punishment within the classifications of offenses, necessarily took into account the culpability inherent in each offense.

State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

## A. Lengths of Sentences

The trial court sentenced the Defendant as a Range I, standard offender to four years for aggravated assault, in this case a Class C felony. See Tenn. Code Ann. § 39-13-102(d)(1). The appropriate sentencing range for this conviction is between three and six years. See id. § 40-35-112(a)(3). In sentencing the Defendant for aggravated assault, the trial court applied enhancement factor (7)[1]: "The personal injuries inflicted upon . . . the victim [were] particularly great . . . ." Id. § 40-35-114(7). The indictment charging the Defendant with aggravated assault contained two counts. The judgment form reflects that the Defendant pled guilty to the first count, which stated:

> [O]n or about the 20th day of December, 1998, and in the State and County aforesaid, [the Defendant] unlawfully, feloniously, knowingly or recklessly did cause serious bodily injury to Michael Carwell, to-wit: by kicking the said Michael Carwell causing crushed and broken bones in his left leg, in violation of TCA 39-13-102 and against the peace and dignity of the State of Tennessee.

Serious bodily injury is defined as "[a] substantial risk of death; . . . [p]rotracted unconsciousness; . . . [e]xtreme physical pain; . . . [p]rotracted or obvious disfigurement; or . . . [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Id. § 39-11-106(34). The Tennessee Supreme Court has determined that "[t]hese conditions satisfy the definition of a 'particularly great' injury," State v. Jones, 883 S.W.2d 597, 602 (Tenn. 1994), and thus, "[t]he necessary conclusion is that proof of serious bodily injury will always constitute proof of particularly great injury." Id. The supreme court has therefore held that enhancement factor (7) is "an element of the offense of aggravated assault causing serious bodily injury," id., and for this reason, cannot be used to enhance the Defendant's sentence for aggravated assault.

In sentencing the Defendant for aggravated assault, the court also applied enhancement factor (10), that "[t]he defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense." Id. § 40-35-114(10). In doing so, the court specified that the Defendant possessed a knife during the offense. As we have previously stated, the Defendant pled guilty to aggravated assault causing serious bodily injury. The use of a weapon, specifically a knife, is not an element of this offense, and we therefore conclude that the trial court did not err by applying enhancement factor (10). See id. § 40-35-114(10). Finally, the trial court applied mitigating factor (13), the catchall factor, see id. § 40-35-113(13), stating, "Mr. Guerard entered a plea of guilty avoiding the necessity of having a trial and the associated time, effort and expense."

---

[1] We note that because of recent statutory amendments, the enhancement factor numbers changed between the time of sentencing in this case and this appeal. Compare Tenn. Code Ann. § 40-35-114 (1997) with Tenn. Code Ann. § 40-35-114 (Supp. 2002). However, the substance of the factors discussed in this case did not change as a result of the amendments.

The trial court sentenced the Defendant to eleven months and twenty-nine days for reckless endangerment, the maximum allowable sentence for a Class A misdemeanor. See id. §§ 39-13-103(b), 40-35-111(e)(1). In sentencing the Defendant for reckless endangerment, the trial court, pointing out the Defendant's prior conviction for aggravated assault, applied enhancement factor (2): "The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range . . . ." Id. § 40-35-114(2). The court also applied enhancement factor (9), that "[t]he defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community." Id. § 40-35-114(9). The trial court noted that the Defendant was on judicial diversion for aggravated assault at the time he committed the crime of reckless endangerment.

In addition, the court applied enhancement factor (6) when sentencing the Defendant for reckless endangerment: "The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense." Id. § 40-35-114(6). In applying enhancement factor (6), the trial court made the following comments:

> The testimony, in substance, by Ms. Williams regarding the facts and circumstances of reckless endangerment were that at one time Mr. Guerard turned on the water in the bathtub and ran a tub of water; or at least a sufficient amount of water in which he could submerge her head. She said that he put her head under the water at least on two occasions if not three. She described taking in water.
> And [the Defendant] flatly denies that. He said he didn't run a tub of water, he was in the bathtub when she came home, and that her testimony was a lie with respect to that.
> One or the other of these two people with respect to what happened in the bathtub is telling the Court a lie. And somebody today committed perjury with respect to those events.
> Those are not two different stories that two different reasonable people would perceive in a different way and both be telling the truth. . . .
> The Court has to decide who's telling the truth and who's lying, because if Mr. Guerard is telling the truth then this cannot be an enhancement factor. If Ms. Williams is telling the truth then it can be.
> . . . [T]he Court has considered the demeanor of both of the witnesses. The Court has considered all of the factors that are permitted by law in determining the credibility of witnesses; whether the testimony is consistent with the other facts and circumstances that are testified to, the demeanor of the witness, whether . . . there is some motivation to swear to a falsehood before a court.
> The Court also in aiding it to determine which of the two is telling the truth considers the fact that Mr. Guerard entered a plea of guilty to reckless endangerment. He entered a plea of no contest to attempt to commit robbery, but he entered a plea of guilty to reckless endangerment which was predicated upon the facts and circumstances outlined by Ms. Williams when she testified as to what took place in the bathroom.

So, considering both testimonies of these two people, all of the factors that the Court can consider in making a determination as to who's telling the truth and who's lying the Court accredits the testimony of Ms. Williams and discredits that testimony of Mr. Guerard with respect to his part of the overall testimony and finds that . . . the facts and circumstances of the criminal endangerment were supported by the testimony of Ms. Williams about submerging her head under water, and therefore the Court applies this as a[n] enhancement factor.

Finally, the trial court sentenced the Defendant as a Range I, standard offender to three years for criminal attempt to commit robbery, a Class D felony. See id. §§ 39-12-107(a), 39-13-401(b). The appropriate sentencing range for this conviction is between two and four years. See id. § 40-35-112(a)(4). In sentencing the Defendant for attempted robbery, the trial court applied enhancement factor (2), stating that the Defendant had a previous history of criminal behavior. See id. § 40-35-114(2). It next applied enhancement factor (9), that the Defendant had a history of unwillingness to comply with the conditions of a sentence involving release in the community, see id. § 40-35-114(9); in doing so, the court pointed out that the Defendant was on probation at the time he committed attempted robbery. Finally, for both the Defendant's conviction for reckless endangerment and for his conviction for attempted robbery, the court considered as mitigation that the Defendant pled guilty and nolo contendere, thus "avoiding the necessity for the related expense, time, and effort associated with a trial." See id. § 40-35-113(13).

We find no error by the trial court in its application of mitigating and enhancement factors when sentencing the Defendant for reckless endangerment and attempted robbery. We thus conclude that the lengths of the Defendant's sentences for these convictions are neither improper nor excessive.

As we have noted, however, we conclude that the trial court erred by applying enhancement factor (7), see id. § 40-35-114(7), when sentencing the Defendant for aggravated assault. Nonetheless, the wrongful application of one or more enhancement factors by the trial court does not necessarily lead to a reduction in the length of the sentence. See State v. Winfield, 23 S.W.3d 279, 284 (Tenn. 2000). A determination that one or more enhancement factors were improperly considered requires that we review the evidence supporting any remaining enhancement factors, as well as the evidence supporting any mitigating factors. State v. Imfeld, 70 S.W.3d 698, 707 (Tenn. 2002). As we have previously stated, we agree, based upon the record, with the trial court's application of enhancement factor (10) when sentencing the Defendant for aggravated assault. We also find no error by the trial court in applying mitigating factor (13) when sentencing the Defendant for aggravated assault. Based upon these two factors, we conclude that the Defendant's four-year sentence within a three to six year sentencing range, see Tenn. Code Ann. § 40-35-112(a)(3), is neither excessive nor improper. We therefore conclude that the lengths of the Defendant's sentences are appropriate.

## B. ALTERNATIVE SENTENCING

The Defendant next contends that the trial court erred by denying him an alternative sentence. Tennessee Code Annotated § 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration . . . .

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary." Id. § 40-35-102(6). Furthermore, unless sufficient evidence rebuts the presumption, "[t]he trial court must presume that a defendant sentenced to eight years or less and not an offender for whom incarceration is a priority is subject to alternative sentencing and that a sentence other than incarceration would result in successful rehabilitation . . . ." State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993); see also Tenn. Code Ann. § 40-35-303(a). In this case, the Defendant was convicted of reckless endangerment, a Class A misdemeanor, see Tenn. Code Ann. § 39-13-103(b); attempted robbery, a Class D felony, see id. §§ 39-12-107(a), 39-13-401(b); and aggravated assault, a Class C felony. See id. § 39-13-102(d)(1). As a Range I, standard offender convicted of and sentenced to less than eight years for each of these offenses, the Defendant was eligible for alternative sentencing. See id. §§ 40-35-102(6), 40-35-303(a); Byrd, 861 S.W.2d at 379-80.

However, all offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing State v. Moss, 727 S.W.2d 229, 235 (Tenn. 1986)). Even if a defendant is presumed to be a favorable candidate for alternative sentencing under Tennessee Code Annotated § 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if

(A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider Tennessee Code Annotated § 40-35-103(5), which states, in pertinent part, "The potential or lack of potential for the rehabilitation or treatment of a defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-

103(5); State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). The trial court may consider a defendant's untruthfulness and lack of candor as they relate to the potential for rehabilitation. See State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); see also State v. Bunch, 646 S.W.2d 158, 160-61 (Tenn. 1983); State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); State v. Williamson, 919 S.W.2d 69, 84 (Tenn. Crim. App. 1995); State v. Dowdy, 894 S.W.2d at 305-06 (Tenn. Crim. App. 1994).

"Although probation 'must be automatically considered as a sentencing option for eligible defendants, the defendant is not automatically entitled to probation as a matter of law.'" State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997) (citing Tenn. Code Ann. § 40-35-303(b) sentencing comm'n cmts). In determining whether to grant or deny probation, the trial court may consider the circumstances of the offense; the defendant's criminal record, background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The Defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169.

In this case, the trial court acknowledged that the Defendant was presumed to be a favorable candidate for alternative sentencing. However, the court then found that the Defendant was not truthful when he testified at the sentencing hearing. The court stated,

> You would think after spending 280 days in jail one would come to court and tell the truth to avoid further confinement instead of compounding the whole problem by continuing to lie.
> The Court finds . . . [,]given the fact that [the Defendant has] been in confinement for 280 days[,] that the prospects of rehabilitation without further confinement are nonexistent.

Based upon the Defendant's lack of candor with the court, the trial court denied alternative sentencing.

The trial court's finding that the defendant is a poor candidate for rehabilitation due to his untruthfulness is supported by the record. Furthermore, we note that "[m]easures less restrictive than confinement" were recently applied unsuccessfully to the Defendant. Tenn. Code Ann. § 40-35-103(1)(C). The Defendant was on probation for aggravated assault at the time he committed the crimes of reckless endangerment and attempted robbery. For these reasons, we conclude that the trial court did not err by denying alternative sentencing in this case.

Accordingly, we AFFIRM the judgment of the trial court.

_____
JERRY L. SMITH, JUDGE

-14-